IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JOHN H. WILLIAMS, *et al*. | : | CIVIL ACTION |
| | : | |
| v. | : | NO. 07-2765 |
| | : | |
| WELLS FARGO FINANCIAL ACCEPTANCE | : : | |

## MEMORANDUM OPINION

Savage, J.                                                                                           July 3, 2008

### Introduction

In this employment discrimination action,[1] the plaintiff John Williams ("Williams") claims that his former employer, Wells Fargo Financial Acceptance ("Wells Fargo"), discriminated against him on the basis of his race when it terminated his employment because he sent emails that contained sexually suggestive and otherwise inappropriate jokes or picture attachments in violation of its Information Security and Sexual Harassment policies. He alleges that his termination, as well as that of 29 other African-American employees, was the result of racial discrimination.[2]

Moving for summary judgment, Wells Fargo contends that Williams cannot make out a claim for employment discrimination because he has not shown that the person who decided to terminate him knew his race or that of the other terminated employees, and he has not shown that he was treated differently than similarly situated employees of a

---

[1] Plaintiff asserts claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2; Section 1981 of the Civil Rights Act, 42 U.S.C. § 1981; and the Pennsylvania Human Relations Act, 43 P.S. § 951 ("PHRA").

[2] The original case was filed by Williams and sixteen other African Americans whose employment was terminated by Wells Fargo. On May 5, 2008, the court severed the causes of action of each of the plaintiffs. (*See* Document No. 58).

different race. It asserts that Williams' violations of the company's Information Security and Sexual Harassment policies are legitimate, nondiscriminatory reasons for terminating him from his position and that he cannot point to sufficient evidence demonstrating that this legitimate reason is pretextual.

Because Williams has established a *prima facie* case of racial discrimination, and has adduced enough evidence for a jury to reasonably infer that Wells Fargo's articulated reason for terminating Williams is pretextual, the motion for summary judgment will be denied.

## I. Background

On November 5, 2005, while conducting a routine quality assurance review of operations clerk employee Rachel Budnick's telephone and computer activity, Ryan Bowie, a collections supervisor at Wells Fargo in Chester, Pennsylvania, saw that Budnick had accessed an email and website called "orgasmic simulator." He reported his discovery to Mauli Giesbaum, human resources consultant; Courtney Walker, his supervisor; and Kathy Toal, Walker's supervisor, all of whom were located in Chester. Giesbaum contacted employee relations in Des Moines, Iowa. The investigation of Budnick's email activity was assigned to Wanda Conway, an employee relations consultant in Des Moines.

Conway conducted a formal fact finding investigation. She started with Budnick's email account and saw that she had received the "orgasmic simulator" email from another Wells Fargo collections employee, Asheena Williams. She then traced a chain of senders and recipients of the "orgasmic simulator" email by looking in the "in-box," "deleted items" and "sent box" of the email account of each person in the chain. Following this chain, Conway found and reviewed email accounts of 74 Wells Fargo employees who had

received or sent inappropriate emails.[3]

Of the 74 employees investigated, 66 were African American. The investigation led to the termination of 31 employees, 30 of whom were African American.[4] The firings took place in three phases: 16 employees were terminated within the course of a week in November, 2005; nine, on December 2, 2005; and six, on February 21, 2006. After the investigation and all of the terminations were completed, 21 employees received warnings, 18 of whom were African American. Conway issued the report of her investigation on March 14, 2006.

At the time of the investigation, there were approximately 700 employees at the Chester office, 45% of whom were African American. Eighty-nine per cent of the employees Conway investigated were African American. Wells Fargo claims that it "would have been impossible" to review the email accounts of all 700 employees in Chester.[5]

Conway testified that she conducted her investigation from her desktop computer and that she did not know the racial identity of Williams or of the other employees whose email accounts were examined. She said that she did not access information that would have revealed the racial background of each employee she was investigating until after all of the terminations were complete. Conway and other managers testified that their communications were by phone only. Conway testified that she recommended whom to discipline and what discipline to impose after consulting her supervisor, Sharon Louis-

---

[3] Later, at the request of one terminated employee (rather than from the chain of emails she was tracing), Conway investigated two more employees, making the total number of employees investigated 76.

[4] Conway Aff., Ex. 38 to Def.'s Mot. for Summ. J.

[5] Def.'s Mot. for Summ. J. at 16.

Goldford, in Des Moines.  She stated she did not inform the on-site managers in Chester of the names of the employees that she was investigating until immediately before the managers terminated them, and, except in one case, never showed the managers the actual emails at issue.  She claimed she only discussed with the local managers what discipline should be imposed based upon what each employee did with each email.  In the one case where Conway showed Kathy Toal, the loss mitigation manager in Chester, an email, it was to determine whether "the context was racist" because Conway was not familiar with the terminology.[6]

On November 22, 2005, between the first and second waves of terminations, several of the fired employees appeared on a local news broadcast. These former employees, all of whom are African American, stated that they felt they had been fired on account of their race because other non-African Americans who sent the same types of emails were not fired.  They indicated they were considering filing a complaint with the Equal Employment Opportunity Commission and hiring a class action attorney.

Within days of the airing of this newscast, Conway, Christine Marshall (Vice President Human Resources and located in the Chester office), Toal, and several other managers involved in or affected by the investigation viewed a videotape of the newscast. There was a conference call about the broadcast in which the managers in Des Moines and Chester, and counsel participated.[7]

After Marshall viewed the November newscast and became aware of allegations of racial discrimination, she discussed with Conway's supervisor, Louis-Goldford, whether

---

[6] *Id.* at 18-21.

[7] Dep. of Christine Marshall at 186-89.

they should conduct random sampling and go outside the original chain of emails being investigated in order to ensure that the investigation was being done fairly. Louis-Goldford decided against it, supposedly because it was not the "normal protocol for an email investigation."[8]

On February 6, 2006, between the second and third waves of firings, counsel notified Wells Fargo in a letter that it represented Williams and sixteen other terminated employees "regarding claims of racial discrimination related to their termination." The letter stated that "there is significant evidence showing that these individuals were terminated based on their race in violation of federal law."[9]

## II.  Summary Judgment Standard

Summary judgment is appropriate if "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In examining the motion, we must view the facts in the light most favorable to the nonmovant and draw all reasonable inferences in his favor. *Hankins v. City of Philadelphia*, 189 F.3d 353, 363 (3d Cir. 1999). This standard is applied with "added rigor in employment discrimination cases, where intent and credibility are crucial issues." *Id.* (quoting *Stewart v. Rutgers, The State Univ.*, 120 F.3d 426, 431 (3d Cir. 1997)).

The party moving for summary judgment bears the initial burden of demonstrating that there are no genuine issues of material fact. Fed. R. Civ. P. 56(c). Once the movant has done so, the opposing party cannot rest on the pleadings. To defeat summary judgment, he must come forward with probative evidence establishing the *prima facie*

---

[8] *Id.* at 206-11.

[9] Pl.'s Resp. to Def.'s Mot. for Summ. J. at 28, and Ex. 22.

elements of his claim. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). The nonmovant must show more than the "mere existence of a scintilla of evidence" for elements on which he bears the burden of production. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). An inference based upon speculation or conjecture does not create a material fact. *Robertson v. Allied Signal, Inc.*, 914 F.2d 360, 382 n.12 (3d Cir. 1990).

In an employment discrimination case, "the burden of persuasion on summary judgment remains unalterably with the employer as movant." *Doe v. C.A.R.S. Protection Plus, Inc.*, 527 F.3d 358, 362 (3d Cir. 2008) (citation omitted). Hence, the employer must persuade the court that even if all of the inferences that could reasonably be drawn from the evidentiary materials of record were viewed in the light most favorable to the plaintiff, no reasonable jury could find in the plaintiff's favor. *Id.*

### III. Employment Discrimination

Disparate treatment discrimination actions brought under Title VII are proven by using either direct or indirect evidence of intent to discriminate. *C.A.R.S. Protection Plus*, 527 F.3d at 364. Williams is proceeding under a theory of indirect evidence, which is governed by the three-step *McDonnell Douglas-Burdine* burden-shifting standard. *Id.*; *Stewart*, 120 F.3d at 431-32 (citing *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248 (1981); *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)).[10] Under this analysis, the plaintiff must first present enough evidence to make out a *prima facie* case. If he does, at the second step, the employer must produce evidence of a legitimate,

---

[10] The *McDonnell Douglas* standard also applies to claims brought under § 1981, *see Stewart*, 120 F.3d at 432, and under the PHRA. *See Jones v. School Dist. of Philadelphia*, 198 F.3d 403, 410 (3d Cir. 1999).

nondiscriminatory reason for the adverse employment action. At the third step, the plaintiff must show that the employer's proffered reason for taking the adverse action was merely a pretext for the real reason behind the adverse action, namely discrimination. *Stewart*, 120 F.3d at 432-33; *Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir. 1994).

### *Prima Facie Case*

To make out a *prima facie* case of intentional discrimination, Williams must show that: (1) he is a member of a protected class; (2) he was qualified for the job; (3) he suffered an adverse employment action; and (4) similarly situated persons who are not members of the protected class were treated more favorably, or that the circumstances of the termination give rise to an inference of discrimination. *Abramson v. William Paterson Coll. of New Jersey*, 260 F.3d 265, 281-82 (3d Cir. 2001); *Goosby v. Johnson & Johnson Med., Inc.*, 228 F.3d 313, 318 (3d Cir. 2000).

Establishing a *prima facie* case of discrimination under Title VII is not onerous and "poses a burden easily met." *C.A.R.S. Protection Plus*, 527 F.3d at 365 (citing *Burdine*, 450 U.S. at 253). *See also Scheidemantle v. Slippery Rock Univ. State Sys. of Higher Educ.*, 470 F.3d 535, 539 (3d Cir. 2006) ("[T]here is a low bar for establishing a *prima facie* case of employment discrimination."); *Marzano v. Computer Sci. Corp.*, 91 F.3d 497, 508 (3d Cir. 1996) (stating that the evidentiary burden at this stage is "rather modest" because its purpose is to demonstrate that discrimination could have been a reason for the employer's action). In addition, the nature of the required showing to establish a *prima facie* case of disparate treatment by indirect evidence varies with the circumstances of the particular case. *C.A.R.S. Protection Plus*, 527 F.3d at 365 (citing *Jones v. School Dist. of Philadelphia*, 198 F.3d 403, 411 (3d Cir. 1999)); *Torre v. Casio, Inc.*, 42 F.3d 825, 830 (3d

Cir. 1994)).

Wells Fargo disputes only the fourth element - that similarly situated employees of a different race were treated more favorably. It expressly concedes that Williams, an African American, is a member of a protected class. It does not, nor can it, dispute that Williams was qualified for his position and that he suffered an adverse employment action.[11] Thus, whether Williams has made out a *prima facie* case of intentional racial discrimination turns on whether non-African-American employees who engaged in the same conduct as he did were not fired.

As a threshold matter, Wells Fargo argues that Williams cannot prove racial animus as a matter of law because there is no evidence that the investigation was conducted or disciplinary decisions were made with knowledge of the races of the individuals involved. Specifically, Wells Fargo contends that there is no evidence that Wanda Conway, who conducted the investigation and made the final disciplinary recommendations, knew the racial identities of the employees she investigated. In essence, it asserts that Conway conducted a "color-blind investigation," using her desktop computer at her office in Des Moines without knowing the race of Williams or of the other employees whose emails were examined. Wells Fargo claims that Conway did not access documentation that would have revealed the employees' races until after Williams and the other employees were terminated.[12]

Although Wells Fargo correctly states the general rule that there can be no claim of disparate treatment where the employer made the adverse employment decision without

---

[11] Def.'s Mot. for Summ. J. at 18; Pl.'s Resp. at 20.

[12] Def.'s Mot. for Summ. J. at 18-21.

awareness of the personal attribute that is the claimed discriminatory bias, *see Geraci v. Moody-Tottrup Int'l, Inc.*, 82 F.3d 578, 581 (3d Cir.1996), it cannot rely solely on its own presentation and interpretation of the evidence. *El v. Southeastern Pennsylvania Transp. Auth.*, 479 F.3d 232, 237, 238 (3d Cir. 2007) ("When a witness's credibility is critical to supporting the necessary findings of fact, the district court must consider whether there are sufficient grounds for impeachment that would place the facts to which he testifies in legitimate dispute. . . . [Q]uestions about credibility, gaps in the evidence, and doubts as to the sufficiency of the movant's proof, will [defeat a motion for summary judgment]."); *Copeland v. Delphi E&E*, No. 1:01cv01, 2002 U.S. Dist. LEXIS 11906, at *11 (W.D. Mi. 2002) ("Mere denials on the part of decision makers will not necessarily establish that a defendant was unaware of the [employee's] race. Circumstantial evidence – such as the fact that decisionmakers had access to information about a plaintiff's race. . . may raise a genuine issue of fact on the question."); *State Farm Mut. Auto Ins. Co. v. Philly Family Practice, Inc.*, 525 F.Supp.2d 718, 726 (E.D. Pa. 2007) ("Defendant Mandale's self-serving affidavit, however, is an unreliable foundation to support his motion for summary judgment."). Here, Williams has presented ample evidence from which a jury could find that the decision makers, including Conway, were aware of the races of the terminated and non-terminated employees who had engaged in the same violations of company policy.

First, Conway, as a manager, had access to the biographical data pertaining to each employee she investigated, including the plaintiff.[13] Indeed, she admits that she accessed the biographical data, including the racial identities, of all of the employees she

---

[13] Dep. of Wanda Conway at 26, 51-52; Marshall dep. at 129-130, 133.

9

investigated. Although Wells Fargo contends that this did not occur until after the employees were terminated, the basis for this assertion is Conway's own testimony.[14]

Whether Conway did or did not access the racial identity information of the employees she was investigating before deciding to terminate them is a question for the jury. Conway's self-serving statement that she did not access the information is not enough to establish that she did not actually do it.

Conway gave conflicting versions of when she first learned the racial identities of the employees she investigated. She did access the biographical data of the employees being investigated after viewing the local news broadcast that aired on November 22, 2005, in which several of the Wells Fargo employees, all of whom are African American, stated that they felt they had been fired on account of their race because other non-African Americans who sent the same emails were not fired. Conway admitted that she saw a videotape of this newscast within days of its airing in November of 2005. She also admitted that she researched the racial identities of the employees she investigated in order to respond to the allegations of discrimination made by the former employees in the news broadcast. She testified, however, that she did not access this racial identity data until after she completed the investigation and was preparing her investigative report in March of 2006, which was more than three months after she viewed the newscast.[15]

It is for the jury to determine when - before or after her investigation - Conway accessed biographical data about any of the employees who were investigated. Because Conway admitted that she researched the racial identities of the employees she

---

[14] Def.'s Mot. for Summ. J. at 12-13; Def.'s Reply at 3; Conway dep. at 41-42.

[15] Conway dep. at 21-27.

investigated in order to respond to the allegations of racial discrimination made in the November newscast, a reasonable juror could believe or disbelieve her claim that she waited more than three months after viewing the newscast to access the biographical data.

Second, six months before the terminations occurred, Conway facilitated a training for managers that addressed how to administer discipline and corrective action to Wells Fargo employees. The training manual instructed managers to ascertain whether an employee targeted for discipline is a member of a "protected class" before deciding what corrective action to impose. Specifically, it stated: "It's important for you to be able to identify the protected classes. Knowledge of the protected classes assists you in recognizing and reevaluating management decisions that could appear to be based on a protected class rather than a legitimate business need."[16] A reasonable jury could find that Conway followed her own instructions to Wells Fargo managers and ascertained whether the employees she was investigating were members of a protected class.

Third, because Conway admits that she saw the newscast shortly after the first wave of terminations, and the former employees who appeared in the newscast were African American, Conway knew the racial background of many of the employees she was investigating prior to the second and third waves of terminations. Knowing that a claim of discrimination was being made certainly could have prompted Conway to check whether the employees targeted for the next wave of terminations were members of a protected class. A jury could conclude that she did.

Fourth, many of the offending emails for which Conway recommended employees be terminated contained photographs of or explicit references to African Americans, which

---

[16] Counseling and Corrective Action Facilitator Guide at 12-13 (WF 004765-66).

could have alerted Conway to the fact that many of the employees she was investigating were African American. For example, the subject line of one email was "My Black People - Why," and it had many photographs of African Americans; the "Raven Simone Done Lost Her Mind" and "Why Serena Why" emails also contained photos of African Americans. In addition, Conway thought one email might be racist, and consulted with Toal about its content. If she suspected the employees were engaging in racist conduct, she may have wanted to determine the racial identities of those making them. All of these things could support an inference that Conway knew or inquired about the racial background of the employees she was investigating prior to their terminations.

Finally, even assuming Conway did not know the racial background of Williams and the other employees she was investigating until after they were terminated, it is undisputed that she did not make the final decisions to terminate Williams and the other employees. Although she recommended whom and how to discipline, the managers at Wells Fargo's Chester office made the ultimate decisions.[17] No one disputes that the Chester managers knew the race of Williams and the other employees they decided to fire.

Given the inferences that can be drawn from the evidence in his favor, Williams has made the threshold showing that the disciplinary decisions were made by management who had knowledge of the races of the individuals involved. Thus, the analysis focuses on whether there is sufficient evidence to permit a jury to find that similarly situated employees of a different race were treated more favorably.

Williams points to Wells Fargo's differing treatment of three non-African-American employees. Wells Fargo contends that two of these non-African-American employees

---

[17] Dep. of Kathleen Toal at 11-13; Marshall dep. at 169-70.

were not similarly situated to Williams, and the one that was similarly situated was not treated more favorably.  In addition, Wells Fargo argues that the comparators Williams presents are not valid because Conway, the "decisionmaker," did not know of any non-African-American employees who engaged in similar misconduct and was not aware of their alleged infractions.

First, Williams cites Candi Goldate, a Caucasian employee, as having received more favorable treatment than similarly situated African-American employees.  He argues that, although Conway knew as early as November 10, 2005, that Goldate had forwarded an email entitled "Things You Don't Normally See at the Zoo" and had emailed an inappropriate picture of herself and forwarded several personal "MySpace" emails, six African-American employees were terminated more than two months earlier than Goldate for sending only the "Zoo" email.  By December 15, 2005, Conway knew that Goldate had sent an email containing pictures of scantily clad men, but still, did not fire Goldate until more than two months later.  Williams contends that the only reason Goldate was fired was because Wells Fargo knew that a race discrimination lawsuit was imminent.

Wells Fargo contends that Conway did not initially recommend Goldate's termination because Conway "felt" that the printout she had of the "Zoo" email did not clearly show that pictures were attached, and, consequently, she set Goldate's file aside to be reviewed at a later date.  Wells Fargo claims that Goldate was treated the same as an African-American employee, Shelby McKnight.  In McKnight's case, it also was unclear whether she had sent picture attachments, and Conway deferred a decision on her as well.

Whether Conway treated Goldate more favorably than other employees who were African American is a question for the jury.  The printout of the "Zoo" email that Goldate

forwarded contains replies from two other employees commenting on the attached pictures, which clearly demonstrate that Goldate emailed attachments.[18]  Thus, a reasonable juror could conclude that Conway ignored this obvious fact in order to give Goldate favorable treatment.

Second, Williams cites Kim Caniello, a Caucasian employee, as having received favorable treatment.  Several months before the investigation began in this case, Caniello had been caught using proprietary software to retrieve personal information for Wells Fargo customer and baseball player Derek Jeter.  Williams, who was Caniello's supervisor, recommended firing her for this conduct because she had previously expressed her strong interest in Jeter, and this showed she was "stalking" him.  Conway and Toal decided she should receive only a written warning.

Without explaining how, Wells Fargo asserts that Caniello is not similarly situated to the employees who were terminated in this case.  Wells Fargo states that because Caniello denied she conducted an inappropriate search on her computer and her computer was not secured at the time the search was conducted, Conway and Toal "felt" they did not have enough evidence to prove Caniello had engaged in the misconduct. Consequently, they decided not to terminate her employment.

A jury could consider Williams and Caniello similarly situated because, like the sending of inappropriate emails, her alleged conduct violated Wells Fargo's Information Security Policy. Williams has presented evidence that Caniello was treated more favorably than he was in that she had an opportunity to defend herself and rebut the allegations

---

[18] Pl.'s Resp. to Def.'s Mot. for Summ. J., Ex. 21 (WF 1243).

against her before discipline was imposed, while he and the other African-American employees who were terminated had no chance to answer the charges against them. In addition, Caniello received only a warning when there was ample evidence that she committed the alleged misconduct.

Third, Williams cites Chantriath Phommathep, an Asian employee, as having received favorable treatment. Conway knew that this employee forwarded emails containing pictures of scantily clad women and men, as well as lewd jokes, but Conway still recommended that she receive only a warning. Wells Fargo provides no explanation of its decision not to terminate Phommathep.

Finally, the statistical breakdown of the employees who were investigated and terminated supports the plaintiff's *prima facie* case of racial animus. *See Rizzo PPL Serv. Corp.*, Nos. Civ.A. 03-5779, 03-5780, 03-5781, 2005 WL 913091, at *10 (E.D. Pa. April 19, 2005). Here, of the 74 employees investigated, 66 were African American. Of the 31 employees terminated, 30 were African American.

These facts and the inferences that can be drawn from them constitute sufficient evidence to state a *prima facie* case of race discrimination.

### *Legitimate, Nondiscriminatory Basis for Termination*

Williams having established a *prima facie* case, Wells Fargo must produce evidence of a legitimate, nondiscriminatory reason for terminating Williams' employment. Williams does not appear to contest that Wells Fargo has met its burden on this prong. In addition, the employer's burden to proffer legitimate, nondiscriminatory reasons for adverse employment actions is "relatively light." *Fuentes*, 32 F.3d at 763.

Wells Fargo contends that it terminated Williams for sending emails that it deemed

to be pornographic, obscene and offensive, in violation of its Information Security Policy and Sexual Harassment Policy. It has presented evidence that Williams was informed of and aware of these policies, that he sent emails containing sexually suggestive pictures to several employees during work hours, and that these emails violated the policies. This proffer constitutes a legitimate, non-discriminatory reason for terminating Williams.

### *Pretext*

At the third step of the *McDonnell Douglas* test, Williams must show that Wells Fargo's proffered reason for taking the adverse action was merely a pretext for the real reason behind the adverse action, namely race discrimination. *Stewart*, 120 F.3d at 432-33; *Fuentes*, 32 F.3d at 763. To defeat summary judgment, Williams must

> point to some evidence, direct or circumstantial, from which a fact finder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action.

*Fuentes*, 32 F.3d at 764. *See also C.A.R.S. Protection Plus,* 527 F.3d at 370 (stating that the plaintiff must adduce evidence rebutting the employer's proffered legitimate reasons to allow the factfinder to reasonably infer that the reasons were either a *post hoc* fabrication or otherwise did not actually motivate the adverse employment action).

The employee need not always offer evidence sufficient to discredit all of the rationales advanced by the employer. If the employee casts doubt on a fair number of legitimate reasons advanced by the employer, he need not discredit the remainder. *Tomasso v. The Boeing Co.*, 445 F.3d 702, 706 (3d Cir. 2006) (citing *Fuentes*, 32 F.3d at 764 n. 7). The rejection of some explanations may so undermine the employer's credibility that a rational fact finder could disbelieve the remaining reasons. *Id.* In addition,

> the *prima facie* case and pretext inquiries often overlap. . . . [E]vidence supporting the *prima facie* case is often helpful in the pretext stage, and nothing about the *McDonnell Douglas* formula requires us to ration the evidence between one stage or the other.

*C.A.R.S. Protection Plus,* 527 F.3d at 370.

Here, Williams has met his burden to show pretext. First, he has adduced evidence from which a jury could reasonably infer that Wells Fargo selectively enforced its policies so that it would result in the terminations of numerous African-American employees. For example, he presents evidence, from testimony of non-party witnesses and terminated employees, that it was commonplace at Wells Fargo for all employees, non-African American and African American, to send personal emails, including those with pornographic or sexual content, during work hours. Wells Fargo usually counseled or warned rather than fired employees who violated the company's email policies. In this case, none of the employees who were terminated had been given warnings; and, those employees who did receive warnings instead of being fired were given them after the three waves of terminations and a threat of a racial discrimination lawsuit. In addition, in an employee training session, Wells Fargo showed slides depicting a scenario where an employee received only a written warning for sending "x-rated" emails. Based on this, a jury could reasonably infer that the defendant selectively enforced its email policies and used the most severe discipline available because it would result in the termination of a disproportionate number of African-American employees.

Second, after Marshall, Vice President of Human Resources in the Chester office, viewed the November newscast and became aware of allegations of race discrimination, she discussed with Conway's supervisor, Louis-Goldford, whether they should conduct

random sampling and go beyond the original chain of emails being investigated in order to ensure that the investigation was being done fairly.  Louis-Goldford decided against it because it was not the "normal protocol for an email investigation."[19]  A jury could infer that Louis-Goldford, who is supposedly the only person with whom Conway consulted during her investigation, did not want to conduct random sampling because it might thwart the goal to terminate African-American employees.

Finally, the evidence Williams points to in support of his *prima facie* case also supports a finding of pretext.  For example, the evidence that Wells Fargo treated three similarly situated non-African-American employees more favorably than Williams and the other terminated African-American employees creates a question of fact on the issue of pretext.

## Conclusion

Williams has adduced enough evidence to make out a *prima facie* case of racial discrimination.  There is sufficient evidence from which a reasonable juror could infer that the reasons given by Wells Fargo for firing him were pretextual and non-African-American employees were treated more favorably.  Therefore, the motion for summary judgment will be denied.

---

[19] Marshall dep. at 206-11.